# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

**BMAR & ASSOCIATES, INC.** )
)
**Plaintiff,** )
)
**v.** )     **Civil Action No. WGC-07-1899**
)
**MIDWEST MECHANICAL GROUP,** *et al* )
)
**Defendants.** )
_____)

## MEMORANDUM OPINION

Plaintiff BMAR and Associates, Inc. ("BMAR") brought this action against Defendants Midwest Mechanical Group ("Midwest Mechanical") and Liberty Mutual Insurance Company ("Liberty Mutual") alleging breach of contract on various grounds. The parties consented to proceed before a United States Magistrate Judge for all further proceedings in the case and the entry of a final judgment. *See* Document No. 54.[1] Pending before the Court and ready for resolution is Defendants' Motion for Partial Summary Judgment (Document No. 49). Plaintiff filed a Response (Document No. 58) and Defendants a Reply (Document No. 61). No hearing is deemed necessary and the Court now rules pursuant to Local Rule 105.6 (D. Md. 2009).

## BACKGROUND[2]

BMAR[3] was selected as the contractor for a project by the United States Government. BMAR awarded a subcontract to Kroeschell, Inc. ("Kroeschell") to design and install a boiler

---

[1] The case was subsequently reassigned to the undersigned. *See* Document No. 57.

[2] In determining whether the moving party has shown there are no genuine issues of any material fact, this Court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).

system at the Malcolm Grow Medical Center on Andrews Air Force Base, Maryland ("the boiler system project").  The project is known as a "design/build project."  "Design/build" is defined as

> A:    [A] case where a contractor or a team, which could be a designer, design engineer and a contractor, a joint venture or some type of business relationship, enters a contract to both do the engineering design of the work they in turn install[.]

Mem. Supp. Defs.' Mot. Partial Summ. J. ("Defs.' Mem."), Ex. E (McGuire[4] Dep. 20:1 – 5).

The contract[5] between BMAR and Kroeschell for the boiler system project consisted of three phases.

> A:   The first being what they call the side investigation of which we have, you know, we consult with the engineering firm on the actual requirement or request of the customer which has associated fees which are negotiated.
>
> Then the second phase is the work plan design which is the actual design process, if you want to attach a commercial, you know, description, at which case those fees are negotiated with the architect engineering firm.
>
> It's in those, it's part of our agreement with the architect and engineer to provide the design that's required by the government through our contract.  That's the requirement.  So through the process BMAR has to furnish an architect and engineer company, the experts, to provide the design, the viable design to the government on which the project would commence construction.
>
> Q:  All right.  What's the third phase?
>
> A:  The third phase is the construction phase.

---

[3]   BMAR was acquired by Link Government Services in 2005.  *See* Mem. Supp. Defs' Mot. Partial Summ. J. ("Defs.' Mem."), Ex. C (McBride Dep. 9:7 – 17), Ex. D (Scott Dep. 10:8 – 14).  The Court will refer to Plaintiff as "BMAR" throughout this memorandum opinion.

[4]   Anthony B. McGuire, an expert in mechanical, electrical, plumbing and fire protection engineering, has been retained by Defendants.  In defining the phrase "design/build" Mr. McGuire limited the term in regards to his expertise "in the subcontractor elements being mechanical, electrical, plumbing and fire protection."  Defs.' Mem., Ex. E (McGuire Dep. 19:21 – 23).

[5]   The date of the contract or consultant's agreement is January 1, 2005.  *See* Mem. Supp. Pl.'s Opp'n ("Pl.'s Opp'n"), Ex. B2 (Letter from Scott to Swietek of 7/14/05).

*Id.*, Ex. D (Scott Dep. 30:13 – 31:11). William ("Bill") Scott was BMAR's project manager for the boiler system project. As the project manager Bill Scott was "basically day-to-day operations for BMAR in the role again as project manager and regarding construction management policies and procedures implemented with the subcontractor in an effort to expedite the subcontractor's scope of work." *Id.*, Ex. C (McBride Dep. 31:21 – 32:4).

Kroeschell completed the first two phases of the boiler system project. Kroeschell provided work plan design documents to BMAR which are dated May 27, 2005. *See id.*, Ex. A ¶ 1.2.1 ("All specifications per Kroeschell, Inc. plan documents dated May 27, 2005 (or noted otherwise)."). Before the third phase began, a problem developed with Kroeschell, specifically, bonding issues.

> Q:   What's your understanding of when the decision was made that Midwest would purportedly assume design and engineering responsibility for the project?
>
> A:   We worked with Kroeschell initially to start the project. We tried to get further along in the work plan toward the construction. They could not bond themselves, we had trouble bonding them. So that is when Dan Burrows made a switch from Kroeschell to Midwest. Basically we were trying to work with both entities in good faith to expedite their work and expedite the project for the U.S. government.

*Id.*, Ex. C (McBride Dep. 37:20 – 38:11). Daniel ("Dan") McBride was BMAR's director of construction. In this position Dan McBride was responsible for the entire operation of BMAR's construction department. *Id.*, Ex. C (McBride Dep. 10:7 – 11). Bill Scott, BMAR's project manager for the boiler system project, reported directly to Dan McBride. *Id.*, Ex. C (McBride Dep. 31:6 – 17).

Also, according to Bill Scott, bonding issues complicated Kroeschell's continued participation with the boiler system project.

> A:   And at the time we were working through phase 2 of the work plan, Dan Burrows was employed by Kroeschell.   And upon completion of the work plan, Kroeschell could not continue with the project because they had bonding issues that they couldn't cover.   So they had pretty much backed themselves out of any further obligations to which we agreed to at the time.

*Id.*, Ex. D (Scott Dep. 37:6 – 13).

Daniel ("Dan") Burrows was the President of Kroeschell Engineering at the time Kroeschell entered into an agreement with BMAR for the boiler system project.   Kroeschell Engineering is a division of Kroeschell, Inc.   In this position, Dan Burrows' "primary responsibility was sales and management."   Defs.' Reply, Ex. C (Burrows Dep. 10:15 – 16).   The individuals who worked for him "actually did the engineering and the hard-core design."   *Id.*, Ex. C (Burrows Dep. 10:17 – 18).

Dan Burrows' involvement with the boiler system project was as a salesman.[6]   He did not draft, design and submit plans on behalf of Kroeschell to BMAR for the boiler system project.

---

[6]   What is apparent from reading the depositions of BMAR's employees is their misunderstanding with regard to Dan Burrows' role.

> Q:   Who was the registered engineer for the project?
> A:   I believe it's Dan Burrows.
> Q:   Who is David Nelson?
> A:   His name is familiar to me although I don't know who he is specifically.   I don't even know in what capacity he worked on the project or if he worked on the project.

Defs.' Mem., Ex. C (McBride Dep. 36:11 – 16).

> Q:   Is it your contention then that the July 2005 conversation, teleconference rather, and correspondence such as the correspondence dated July 22, '05, that these reflect Midwest having assumed design and engineering services for the project?
> A:   Certainly they have.   But again, it's all a moot point because the engineer of record was with Kroeschell.   We again tried in good faith to help the principals through the problem so that we could get this project built for the United States by God of America.   So we were helping the subcontractors and the ultimate subcontractor expedite their work.
> Q:   All right.
> A:   I'll add further that I think it is a little bit of a - - I think one of our people at the office answered [the interrogatories], but it's kind of a misnomer to say Kroeschell withdrew from the project because Kroeschell was unable to bond themselves. So that is when we followed Mr. Dan Burrows, engineer of record, to Midwest to expedite the work.

According to Dan Burrows, "David Nelson, DTN, was the project manager and the engineer of record that worked for me that had the responsibility [for drafting, designing and submitting project plans for the boiler system project]."[7] *Id.*, Ex. C (Burrows Dep. 11:15 - 17).

---

*Id.*, Ex. C (McBride Dep. 56:14 – 57:13). Bill Scott, BMAR's project manager, shared this misconception concerning the role of Dan Burrows.

   Q: Who does the [Subcontract Agreement of August 16, 2005] identify as the architect and engineer for the project?
   A: The architect and engineer, if you're going to be specific to a person, has always been Dan Burrows from the inception all the way to completion.

*Id.*, Ex. D (Scott Dep. 18:9 – 13).

   Q: Whose initials are those?
   A: Dan Burrows.
   Q: What is your understanding of the words designed by?
   A: The project and its application were designed by Mr. Dan Burrows.
   Q: What was Dan Burrows' title?
   A: Engineer, project engineer.
   Q: Who was David Nelson?
   A: David Nelson I believe was an employee of Midwest Mechanical, but I can't remember a hundred percent.

*Id.*, Ex. D (Scott Dep. 22:14 – 23:4).

   Q: Who was the engineer of record?
   A: Dan Burrows.
   Q: What can you show me that denotes that Dan Burrows was the engineer of record for the project?
   A: Because Dan Burrows was introduced as engineer of the project, and all the way through he was identified as the engineer of the project, project engineer. I don't and I cannot recollect at any time where he was designated as anything other than the project engineer.

*Id.*, Ex. D (Scott Dep. 27:13 – 28:1).

[7] Toward the end of his deposition Dan Burrows was questioned by Midwest Mechanical and Liberty Mutual's counsel on this issue further.

   Q: And as president of Kroeschell Design Engineering, you were not the design engineer, correct?
   A: Correct. I was the salesman, but not the design engineer of record.
   Q: David Nelson was the design engineer of record?
   A: He was assigned by me because he was a licensed professional engineer, and I could turn that project over to him and then go work on other work.
   Q: All right. So Mr. Nelson was the design engineer of record for the project at Andrews Air Force Base?
   A: Correct.
   Q: And he provided all the drawings and related documents referenced in the subcontract?
   A: Yes. And I believe Kroeschell was paid for their design services for this.

Defs.' Reply, Ex. C (Burrows Dep. 51:17 – 52:10).

Dan Burrows left his employment with Kroeschell on June 30, 2005. *Id.*, Ex. C (Burrows Dep. 8:14). Dan Burrows became interested in a position with Midwest Mechanical on July 1, 2005. *Id.*, Ex. C (Burrows Dep. 12:14 – 16). Dan Burrows subsequently was hired by Midwest Mechanical though the exact date his employment began is not known.

From Dan Burrows' perspective the work he performed for Kroeschell was not identical to his work with Midwest.

> Q:  The work that you were involved with while working with Kroeschell Engineering, did your involvement cease when you switched and began working for Midwest Mechanical?
>
> *            *            *
>
> THE WITNESS:  Yes, it did cease because David Nelson, who was and is a degreed professional engineer, was handling that project and there was no need for me to really be involved because David was acting as both project manager and engineer of record.

*Id.*, Ex. C (Burrows Dep. 13:14 – 17, 23 – 14:3).

Bill Scott, as BMAR's project manager, negotiated the subcontract agreement between BMAR and Midwest Mechanical. *See* Defs.' Mem., Ex. D (Scott Dep. 15:10 – 12). Before the subcontract agreement was signed, Bill Scott attempted to facilitate a smooth transition of the agreement from Kroeschell to Midwest Mechanical. Apparently the transition was not proceeding as quickly as Bill Scott hoped. On an unknown date Bill Scott, on behalf of BMAR, issued a contract to Midwest Mechanical for the work phase of the boiler system project. On July 8, 2005 Gary Finigan[8] of Kroeschell sent the following e-mail to John Caraher of Midwest Mechanical.

---

[8]  Midwest Mechanical and Liberty Mutual seek leave to depose Gary Finigan, a witness BMAR did not identify until four months after the close of discovery. "Defendants will be prejudiced if not allowed to depose Mr. Fin[igan] in order to thoroughly prepare, if necessary, a supplemental memorandum supporting their motion for summary judgment and to prepare for trial." Defs.' Mem. at 5. In their Reply Midwest Mechanical and Liberty Mutual

Background:

I was surprised to learn that BMAR issued a contract to Midwest for the "work phase" at Andrews. I say surprised because Dan [Burrows] and I were supposed to discuss this with BMAR together and give them a clear understanding of our transition plan. This complicates the situation for Kroeschell, as we wanted to either back out completely or perform the project completely (with or without Dan [Burrows]'s consultation). Taking this wrinkle in stride and working toward a solution, I first reminded Dan [Burrows] that this event was not at all in Kroeschell's interest, nor was it in the spirit of the seamless transition we had hoped for. I also restated that any outcome other than complete assignment to one party or the other would be unwise and unacceptable. Dan [Burrows] informed me that letting the contract to Midwest was a BMAR decision, and he recommended that I call BMAR to work it out. I made the call and the update is below.

Additional Background:

The Andrews Project was let to Kroeschell in phases. We have received the Site investigation ($5k paid by BMAR already), Design and Work plan phases ($47k) as well as the Material

---

contend they will be prejudiced if Mr. Finigan is not barred and if the Court does not allow them to depose Mr. Finigan to thoroughly prepare their case.

Midwest Mechanical and Liberty Mutual argue the documents attached to Mr. Finigan's affidavit predate the August 16, 2005 contract between BMAR and Midwest Mechanical and thus are inadmissible under the parole evidence rule. Defs.' Reply at 6. At this juncture of the Memorandum Opinion the Court cites to documents attached to Mr. Finigan's affidavit merely for the purpose of delineating the factual background.

Furthermore, the Court notes that in deposing BMAR's employees, counsel for Defendants asked questions regarding Gary Finigan.

Q: Did you have a conversation with Mr. Finigan regarding a change order to the agreement to cover Midwest's handling of the engineering and design services in exchange for approximately $47,000?
A: No, I'm not, no.
Q: Are you aware of any conversations between Mr. Finigan and anyone from BMAR regarding a change order to the agreement to allow Midwest to step in for Kroeschell as to engineering and design services for the project?
A: I would have to answer that no at this point.

Defs.' Mem., Ex. C (McBride Dep. 48:19 – 49:10).

Q: Do you remember a conversation that you had with Mr. Finigan regarding a change order to the agreement to cover Midwest's handling of the engineering and design services in exchange for approximately $47,000?
A: At this time I do not. I don't have that information in front of me. There was some - - during the transfer there might have been some discussion about who was going to pay for what, but I don't know that there was anything actionable that we executed. I would have to go back and check.

*Id.*, Ex. D (Scott Dep. 45:12 – 46:1).

portion of the job ($852k and this was significantly front loaded to cover overhead and preconstruction costs – please refer to the project budget). We have completed the Work plan and preliminary design, interviewed local subs, written PO's[9] for Materials (roughly [$]550k) and have expended overhead and preconstruction costs to get the job to this point. I would estimate that our out of pocket costs with markup would be in the range from $65 to $75k up to this point.

Update:

I spoke with BMAR (Bill Scott, the PM) regarding writing a change order to the contract that Midwest has in its possession to cover the design phase and work phase. I estimate the value of the change order to be [$]47k.

With this change order in hand, and with an agreement with Midwest as to reimbursement of our out of pocket costs, Kroeschell can gracefully back out of the project. Again, under this transition plan, Midwest would take our work product as it stands, take it to completion (we would not stamp the drawings) and pay us for our costs to date on all phases of work, together with a reasonable markup for overhead. BMAR liked the idea and will let us know on Monday of their final position.

Additionally, in the discussions I had today with the Air Force Staff, they agree that the complete assignment method is the cleanest, since it cuts out layers in the construction phase and project administration (if we keep the design we would have to raise our price to cover our staying involved through closeout). They also would like to have whoever builds this project be in full control and totally responsible for the design/build process (the design drawings, concepts and work plan are NOT intended to be "Plans and Specs").

Next Steps:

Once we agree on the format of the transition, we also need to get Midwest PO's to replace the Kroeschell PO's for the items that have been let to date. I will copy the proposal from each sub/supplier together with any qualifications to their bids and other correspondence in our files and give them to you so that you can prepare the PO's. After we call each supplier/sub on the phone to discuss the situation, I think it would be a good idea to draft a letter, under both our signatures, to each of our vendors, getting

---

[9] Purchase Orders.

their consent to rescind all Kroeschell PO's and accept Midwest PO's with no adverse consequence to either of us.

Dan [Burrows] is aware of a Pre-Con meeting on July 12 at 11 am (EST). I understand that he is going to fly out and attend. If we do not have a firm agreement by Monday morning, we will have to send a representative to attend the meeting as well, at the very least we will attend via conference call.

Let me know if this course of action sounds good and we can button it up Monday morning.

Hope all in the regular Midwest world is going well.

Mem. Supp. Pl.'s Opp'n ("Pl.'s Opp'n), Ex. B1 (E-mail from Finigan to Caraher of 7/8/05).

Six days letter Bill Scott of BMAR sent the following letter to Ed Swietek, President, CEO of Kroeschell.

Due to Kroeschell, Inc.'s recent decision not to continue into the Repair & Renewal Action Phase of this project, BMAR will proceed with negotiations for the construction services of this project with Midwest Mechanical Group.

In lieu of this development, we will still require Kroeschell, Inc. to perform the work, services, and functions according to the terms and conditions contained in your Consultant's Agreement (*MRR-017-01, Dated 01-Jan-05*) and defined in Attachment "A". BMAR expects Kroeschell, Inc. to deliver this work and services "complete", and with 100% approval by USACE/Huntsville in accordance with project schedule.

We are sympathetic to your situation and the decision to complete your involvement in this project prior to any construction start. However, we cannot "terminate" or relinquish you from your obligation or liability as previously agreed upon.

BMAR is not responsible, nor will be responsible for further compensation to Kroeschell, Inc. by BMAR or Midwest Mechanical above or beyond previously negotiated fees as a result of your decision not to engage into the construction phase of this project.

Please feel free to contact me at [xxx-xxx-xxxx] if you have any questions regarding this matter.

*Id.*, Ex. B2 (Letter from Scott to Swietek of 7/14/05 at 1).

In response to Bill Scott's letter, Gary Finigan of Kroeschell sent the following e-mail to

Bill Scott.

> We do not agree with your decision regarding the treatment of this agreement.
>
> 1.   We have incurred costs and ordered materials on the construction phase based upon your direction to release the equipment in May, 2005.   By contracting with Midwest Mechanical, you have also released them on the same scope of work.
>
> 2.   Our initial site investigation and work plan are not intended to stand alone as plans and specs and were not priced in such a manner.  The design concept, developed by Dan Burrows[10] while our employee, is subject to change (and usually requires field modification) during the construction phase, based upon many engineering and site related factors.  IF work plan and concept are not transferred to Midwest Mechanical for ratification and acceptance, we must remain involved in this project at your cost to assure that the design concept and work plan are being properly adhered to.  We do not wish to do that as it adds another layer to the project, complicating the execution of any necessary design change requested during the construction phase.
>
> 3.   The transition of this project to Midwest was done in good faith and was predicated on Dan [Burrows] taking this project "in total" to his new employer.   Our concept and work to date, including subcontractor selections, has been turned over to BMAR and Midwest Mechanical based upon this understanding and also to meet your schedule.
>
> 4.   The pricing of the initial site investigation (5k), the work plan (47k) and the material phases (853k) of this project have already been let to Kroeschell and significant efforts have been expended in the execution of this work.  To satisfy our customer, we have cooperated with BMAR and Midwest in transitioning the project. We do not wish to suffer financially as a result of this cooperation.

---

[10]   This statement by Gary Finigan likely caused Dan McBride and Bill Scott of BMAR to believe Dan Burrows was the engineer of record.  *See* footnote 6 *supra*.

We would like to discuss an equitable solution to this important issue on Monday. I believe a conference call should be arranged to discuss this.

Please inform me if you wish to have anyone from HFO present, though I believe they too agree that having a single entity responsible for the design and construction is preferable, if not a requirement for this project.

Please contact me to arrange a time for a conference call.

*Id.*, Ex. B3 (E-mail from Finigan to Scott of 7/16/05).

Meanwhile, on July 21, 2005, Gary Finigan sent an e-mail to Dan Burrows who, in turn, sent a reply e-mail.

[G]ive me a buzz. I sent an email to Bill Scott excluding you from the conference call regarding Kroeschell's transition to Midwest.

We ultimately want to get off the hook for the design and to get paid for our work to date, but this has been complicated dramatically by [BMAR] issuing a contract to Midwest before we could properly negotiate our way out of the deal.

I also want to understand what you have done since 6/30 relative to this project and what the stage of the workplan and design were as of 6/30. Also need to know whether we sent [BMAR] any design drawings, no matter how conceptual.

Also, where are all of the contract files on this project?

*Id.*, Ex. B4 (E-mail from Finigan to Burrows of 7/21/05 at 2).

Gary, you keep calling this a transition to Midwest. I don't know if BMAR is looking at it as a trans[ition]. I believe they are looking at it as a simple deliverable of the final work plan. Due to the bonding issue (both availability and cost) BMAR was instructed by the HFO to go ahead and get someone else besides Kroeschell to implement the project. I believe from their perspective, they just want the work plan to be completed so that they can pay you.

With that being said, my position on this, is as it has always been.

All we need to do to solve the issues are the following:

- I will handle the costs of structural engineering and boiler permitting as part of the project (approximately $8,000)[.]

- Kroeschell simply cancels the[ir] PO's as agreed and we will re-issue[].

- I have provided the calculations requested for the Work Plan completion as discussed in the phone conference last Tuesday with Dave Nelson on the line. These calculations were for structural and gas pipe sizing.

- If you want me to stamp the drawings, I will do so. I will also stamp drawing for Midwest. This will transfer all responsibility over to us at Midwest, clearing Kroeschell of responsibility. All I ask is for my final expense report be paid, my severance paid and I retain the car.

This will allow Kroeschell to be 100% free of Andrews and will get you paid by BMAR for the Site Survey and Work Plan.

Easy and simple.

As far as the work plan is concerned, as I stated above, Dave [Nelson] agreed to let me provide some structural calculations and gas pipe sizing calc's.

As far as I know, Dave sent a complete set of design drawings to [BMAR], but you would have to contact Dave Nelson to confirm. I do not know where Dave is keeping his file on this project. I gave Dave all that I had on this thing on June 30.

I want to assist in attempting to make Kroeschell as close to whole as possible. I have asked John Re[i]nts to allow you to send to him an accounting of all costs incurred to date on this project (with back-up) and allow him to make a fair and reasonable call. I know JR will be fair and will assist in resolving all of these issues.

*Id.*, Ex. B4 (E-mail from Burrows to Finigan of 7/21/05 at 1).

The following day Gary Finigan sent an e-mail to Bill Scott with a proposed solution.

[H]ere is how we can get this done:

Kroeschell will provide a set of stamped drawings to BMAR.

12

Kroeschell will cover the drawings with a letter that states that we withdraw from the project and will not perform any further work on the project.

Midwest (Dan [Burrows] to stamp) will provide a set of identical Midwest Mechanical stamped drawings AND the identical Midwest Mechanical work plan to BMAR at the same time that Kroeschell withdraws.

Midwest will cover the package with a letter that states that they will perform all work not performed by Kroeschell as of 6/30/05 and that they have read the work plan and understand the scope of the work assumed.

Midwest executes the BMAR contract and returns it to BMAR (they asked about this today).

Midwest executes a hold harmless agreement with Kroeschell related to this project, its design and the work plan. (you should not have a problem with this since you are going to support the design and construction anyway).

Kroeschell will provide Midwest with a list of vendors and PO's which they have cancelled.

Midwest will provide Kroeschell with a list of vendors and PO's which they have replaced.

*Id.*, Ex. B5 (E-mail from Finigan to Scott of 7/22/05 at 1).

That same day Bill Scott sent the following letter to Dan Burrows.

BMAR & Associates, Inc. was selected as the Prime Contractor for the above referenced project by the U.S. Army Corps of Engineers (Huntsville). Upon receipt of this award, it has been our responsibility to submit and complete all deliverables (Site Investigation, Work Plan and Repair & Renewal Action) per the contract and as required within the constraints of the project schedule.

BMAR in good faith entered into an agreement with Kroeschell, Inc. to provide all design and engineering services required to complete the project thru and including the Work Plan Phase on time, with approval by USACE/Huntsville and again, according to the project schedule.

To date, Work Plan requirements have been met to satisfaction with the exception of submittal of the "stamped and signed" project plan design documents. Kroeschell will complete their Work Plan requirements by submitting to BMAR these plan documents w/ cover letter withdrawing from any further project participation. Kroeschell will also be providing to BMAR proof that all previously issued equipment and material purchase orders have been terminated; thus releasing them from any financial obligations. Upon the receipt of these documents it is our intent to fully compensate Kroeschell, Inc. as previously negotiated for the Site Investigation and Work Plan in the amount of $51,300.00

BMAR will then enter into an agreement with Midwest Mechanical Group to perform the construction services for this project based on the following provisions:

▪ Midwest Mechanical will provide "identical" project plan design documents, stamped and signed as required by registered engineer.

▪ Midwest Mechanical will execute the BMAR subcontract (MRR-017-003) and attach letter of proof that all previous Work Plan requirements (to include Design and Engineering Services) will become the sole responsibility of Midwest Mechanical thus transferring any and all general liability for design omissions and/or construction phase engineering revisions.

▪ Midwest Mechanical will provide list of all previously attained vendors and reissued purchase orders for equipment and materials replacing all previous Kroeschell issued purchase orders.

▪ Complete Final Firm-Fixed Construction Proposal w/ all required subcontractor bid back-up.

▪ Completed MDE Air Quality Permit Applications.

BMAR has given Midwest Mechanical and Kroeschell more than enough time to produce an amicable solution between them for the transfer of this project. We have been told on several occasions that transfer would have little or no impact on project schedule. It is now obvious that this is not the case and we must insist that all the above provisions be completed and submitted to this office NLT COB Tuesday, July 26th. If we do not have closure on this agreement by this date, BMAR will have no other recourse than to proceed into the construction phase of this project without your services.

> Please remember that we are sensitive to the problems (including personal) that project transfer may be having on Midwest Mechanical and yourself, and that we are committed to continuing what has to date been a positive business relationship with both Midwest Mechanical and Kroeschell. But this *is* business and we all need to remember our roles, and that the purpose for this project is to deliver (on time!) complete and operational Stem Plants to Andrews Air Force Base.
>
> Please feel free to contact me at [xxx-xxx-xxxx] if you have any questions regarding this matter.

*Id.*, Ex. B6 (Letter from Scott to Burrows of 7/22/05 at 1-2).

Upon receiving Bill Scott's letter, Dan Burrows sent the following e-mail to Gary Finigan and Ed Swietek of Kroeschell.

> I believe that we both received the nasty fax from BMAR and I can not agree more. Please get me ASAP the number of copies of drawings they want stamped and I will get it done. We are working on shop drawings and I will stamp those probably before I stamp Kroeschell's.
>
> Again all I am asking for is my last expense report paid, severance paid and to keep [m]y bonus from 2003, the car.

*Id.*, Ex. B8 (E-mail from Burrows to Finigan, Swietek of 7/22/05).

Seven days later on July 29, 2005, a teleconference meeting was convened regarding the progress of the boiler system project. Bill Scott prepared minutes of the meeting for Gerald Ramos, Facilities Support Division, U.S. Army Engineering & Support Center, Huntsville, Alabama. The first bullet of the minutes states, "[t]o clarify for the record[:] Midwest Mechanical Group, Inc. will replace Kroeschell, Inc. as project Engineer thru the construction phase of this project." *Id.*, Ex. D (Minutes from Scott to Ramos of 7/29/05 at 1).

On August 16, 2005 BMAR and Midwest Mechanical entered into a subcontract agreement (Subcontract #: MRR-017-03). Midwest Mechanical left the job site either in

December 2005, *see* Defs.' Mem., Ex. C (McBride Dep. 65:2 - 8), Ex. D (Scott Dep. 54:19 – 20), or on January 31, 2006, *see* Defs.' Reply, Ex. C (Burrows Dep. 47:10 – 14). From BMAR's perspective, Midwest Mechanical left without completing the job. According to BMAR several attempts were made to coax Midwest Mechanical to complete its assignment. Dissatisfied with Midwest Mechanical's response, on August 14, 2006, Bill Scott (BMAR) sent Dan Burrows (Midwest Mechanical) a termination notice. Thereafter BMAR had to finalize and complete the project.

BMAR has not paid Midwest Mechanical the full amount of the contract since, from BMAR's perspective, Midwest Mechanical failed to fulfill its obligations under the subcontract agreement. On January 12, 2007 BMAR filed a Verified Complaint against Midwest Mechanical and Liberty Mutual in the Second Division of the Christian Circuit Court, in Christian County, Kentucky. On February 15, 2007 Midwest Mechanical and Liberty Mutual filed a Notice of Removal with the United States District Court for the Western District of Kentucky (Paducah Division). *See* Document No. 1. The case was subsequently removed from state court to federal court. *See* Document No. 4.

On June 7, 2007 Midwest Mechanical and Liberty Mutual moved to transfer venue to the United States District Court for the District of Maryland. *See* Document No. 9. In support of their motion Midwest Mechanical and Liberty Mutual noted that of a list of fifty potential witnesses, nearly half of those witnesses reside in Maryland. Most importantly, the construction work that is the subject of dispute is located in Maryland. On July 10, 2007 Judge Thomas B. Russell of the United States District Court for the Western District of Kentucky granted the motion to transfer case, *see* Document No. 10, which this Court received on July 17, 2007.

## JURISDICTION AND VENUE

Subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Plaintiff BMAR[11] is a Kentucky Corporation. *See* Verified Compl. ¶ 1. "KHB Group, LLC, doing business as Midwest Mechanical Group, is a privately held limited liability company organized and operating under the laws of the State of Illinois." Document No. 3. Defendant Liberty Mutual is "a corporation organized and operating under the laws of the [Commonwealth] of Massachusetts." *Id.* The amount in controversy is believed to exceed $75,000, exclusive of interest and costs. *See* Document No. 1 ¶ 7.

Pursuant to 28 U.S.C. § 1391 venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district. Specifically, "the construction work that is the subject of this action is located in Maryland and the operative facts in this case that formed the basis for BMAR's cause of action occurred in Maryland." Mem. Supp. Mot. Transfer Venue at 2.

## STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor*

---

[11] As noted *supra*, in 2005 BMAR was acquired by Link Government Services. *See* Defs.' Mem., Ex. C (McBride Dep. 9:5 – 17). Nevertheless when Plaintiff filed suit in 2007 Plaintiff identified itself as BMAR, not Link Government Services. Plaintiff has not disclosed Link Government Services' state of incorporation or principal place of business.

*Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

On those issues where the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256. However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)). There must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## **DISCUSSION**

A.   *Applicable Substantive Law*

Before addressing the parties' positions regarding genuine issues as to any material fact, the Court must address a preliminary matter. Since this Court's jurisdiction is based on diversity

of citizenship, the principles outlined in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) dictate the application of Maryland law to substantive law questions, because the breach of contract claim stems from Midwest Mechanical's alleged non-performance at the construction work site at Andrews Air Force Base in Maryland.

The August 16, 2005 Subcontract Agreement between BMAR and Midwest Mechanical however selects another jurisdiction's laws to govern any contractual disputes between the parties. Pursuant to Article 12, Claims and Disputes, section 12.3

> Any claim, dispute or other matter in question between the Contractor and the Subcontractor relating to this Agreement, or the Work performed hereunder, shall be governed by the laws of the State of Kentucky, except for issues related to the creation, waiver, or enforcement of mechanic's, materialman's, or other statutory liens, which shall be governed by the law of state wherein the Project is located.

Similarly, Article 27, General Provisions, section 27.8 (Governing Law) directs the application of Kentucky law.

> Except as provided in Article 10[12] above, the validity, construction, scope, and performance of this Agreement shall be governed by the applicable laws of the State of Kentucky. Further, each party hereto consents to the jurisdiction and venue of the courts of the State of Kentucky or, where applicable, the United States District Court in which Hopkinsville is situated with respect to all matters associated with this Agreement.

The lawsuit concerns breach of contract allegations. BMAR's Verified Complaint does not raise any issues regarding the creation, waiver, or enforcement of mechanic's liens, materialman's liens or other statutory liens. Therefore, as intended by the parties, the substantive law of Kentucky governs BMAR's breach of contract claims.

---

[12]   Article 10 concerns "Delays." There is no reference to "Governing Law" in Article 10. The Court presumes the parties intended to refer to "Article 12 above."

*B.*     *Contract Interpretation*

Under Kentucky law when a contract is not ambiguous, a court must look at the four corners of the contract only to determine the intentions of the parties. *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000). "Generally, the interpretation of a contract, including determining whether a contract is ambiguous, is a question of law for the courts and is subject to de novo review." *Cantrell Supply, Inc. v. Liberty Mutual Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002).

The August 16, 2005 Subcontract Agreement between BMAR and Midwest Mechanical identifies the architect/engineer as "Kroeschell, Inc." The subcontractor is identified as "Midwest Mechanical Group." Pursuant to Article 1, Subcontractor's Scope of Work, section 1.2, Midwest Mechanical agrees to "[p]rovide the Work per the Contract Documents, including but not limited to the following Specifications Sections, considered primary to this Subcontract: 1. All specifications per Kroeschell, Inc. plan documents dated May 27, 2005 (or noted otherwise)."

BMAR's position is that, despite the clear and unambiguous language of the agreement identifying Kroeschell as the architect/engineer, Midwest Mechanical became the architect/engineer by entering into the August 16, 2005 Subcontract Agreement.

> Q:    [I]f we turn to interrogatory number 6. BMAR answers that, and I'm reading, when Kroeschell elected to withdraw from the construction aspect of this work, Midwest assumed all design and engineering services by entering into a subcontract with BMAR and providing their stamped and final approved-for construction documents. Do you see that?
>
> A:   Yes.
>
> Q:   Please tell me where in this Subcontract Agreement it requires Midwest to provide design or engineering services for the project.
>
> A:   You want to specifically go to the Subcontract Agreement?

Q:  Sure.

A:  Again, I'd say that the agreement certainly infers that the responsibility for the design is directly with Midwest.  And in error we probably left, and in hindsight we probably left Midwest as the, I'm sorry, Kroeschell as the architect/engineer and we should have had Midwest there.  But for sure the design responsibility through construction was with Midwest.

Defs.' Mem., Ex. C (McBride 54:4 – 55:5).

Bill Scott negotiated the subcontract agreement on behalf of BMAR with Midwest Mechanical.  *See id.*, Ex. D (Scott Dep. 15:10 – 18).  Bill Scott is of the opinion that the engineering and design services for the boiler system project transferred from Kroeschell to Midwest Mechanical.

Q:  Do you know where in the parties' Subcontract Agreement it requires Midwest to provide design or engineering or stamped and final approved for construction documents?

A:  I don't know that it specifically makes it a requirement, but it makes it a requirement for them to adhere to the project design which they subsequently agreed to take ownership and provided certified drawings for which I believe is your Exhibit B or 2.  Why else would we have those documents?

Q:  When you say subsequent to, you mean subsequent to the parties' subcontract subsequent to August of 2005?

A:  At the time the only engineering documents of record that I could attach to the Subcontract Agreement were currently produced by Kroeschell.  That's why all the subcontract language points to Kroeschell as the engineer for record.

*Id.*, Ex. D (Scott Dep. 48:17 – 49:14).

Despite Bill Scott's explanation, the subcontract agreement is not ambiguous on its face.

Kroeschell is identified as the architect/engineer, *not* Midwest Mechanical.

BMAR cites to agreements between BMAR and Midwest Mechanical regarding Midwest Mechanical assuming responsibility for design and engineering.  These agreements and

understandings *predate* the August 16, 2005 Subcontract Agreement.  Article 2, The Subcontract

Documents, contains two sections pertinent to this dispute.  Section 2.1 states

> The Subcontract Documents consist of 1) this Agreement; 2) the Prime Contract No. DACA87-03-D-0009, hereinafter called "Prime Contract" (see 2.2 below), including all conditions to that Agreement (General, Supplemental, and any other Conditions), all Drawings, Specifications, and Contract Documents, along with any modifications and Addenda to that Agreement issued after execution of this Agreement[;] 3) other documents listed by attachment to this Agreement; and 4) Modifications to this Agreement issued after it[]s execution.  These form the Subcontract, and are fully a part of the Subcontract as if attached to this Agreement or repeated herein.  The Subcontract represents the entire and integrated agreement between the parties and *supersedes prior negotiations, representations, or agreements, either written or oral*.

Emphasis added.

Section 2.5 states "[t]his Agreement may only be amended or modified by a Change

Order or other writing signed by both Contractor and Subcontractor."  During his deposition Bill

Scott was asked to define a change order.  "A change order is the addition or deduct of a

subcontractor's scope of work.  It can be just work oriented or it can have a fee associated with

it, either added or deducted."  Defs.' Mem., Ex. D (Scott Dep. 44:8 – 11).  None of BMAR's

employees recall a change order being issued for this subcontract agreement.  *See id.*, Ex. C

(McBride Dep. 47:8 – 48:6), Ex. D (Scott Dep. 44:6 - 45:4).

Article 27, General Provisions, section 27.3 (Modifications and Waiver) states in

pertinent part, "[t]his Agreement *supersedes all written or oral agreements, if any, and

constitutes the entire agreement between the parties* hereto with respect to this Agreement."

Emphasis added.  In a later section, the parties expressed their intention that the August 16, 2005

Subcontract Agreement is the *sole* agreement of the parties with respect to the boiler system

project.  Section 27.5 (Entire Agreement) states

This Agreement, the Exhibits and Schedules hereto and the other documents delivered hereunder *constitute the full and entire understanding and agreement between the parties* with regard to the subjects hereof and thereof, and *supersedes all prior agreements, understandings, inducements or conditions, express or implied, oral or written,* relating to the subject matter hereof, except as herein contained. The express terms hereof control and supersede any course of performance and/or usage of trade inconsistent with any of the terms hereof. This Agreement has been prepared by all of the parties hereto, and no inference of ambiguity against the drafter of a document therefore applies against any party hereto.

Emphasis added.

Having read the August 16, 2005 Subcontract Agreement, the Court finds nothing ambiguous about its terms. The parties to this agreement, BMAR and Midwest Mechanical, expressly stated that all previous agreements or understandings, express or implied, are superseded by the August 16, 2005 Subcontract Agreement. These parties also stated the August 16, 2005 Subcontract Agreement constitutes the full and complete understanding and agreement of the parties. Therefore, all prior agreements or understandings, which BMAR cites to support its contention that Midwest Mechanical assumed the role of project engineer, are superseded by the August 16, 2005 Subcontract Agreement identifying Kroeschell as the architect/engineer.

John F. Caraher is the President of KHB Group, the entity which acquired Midwest Mechanical. John Caraher testified as a corporate designee for KHB Group. In the following colloquy John Caraher explained the circumstances whereby Kroeschell was named the architect/engineer of the subcontract agreement.

Q: Could you tell me why you wouldn't object to the statement that Midwest will replace Kroeschell, Inc., as project engineer through the construction phase of the project?

A: As I mentioned, I'm not sure I was on this conference call, because other items discussed there, I don't recollect. The conference call I was on at around that time, we were originally

talking about taking the whole project over. And Bill Scott of BMAR objected saying that Kroeschell was going to – – they were not going to pay us for the work that Kroeschell already did. So we then agreed that we would take the work from the installation and not the design.

But if they wanted us to take the design, we would go ahead and do that, but they needed to pay us for that. And they were not willing to make that as part of the contract.

Q:   If Midwest was to handle the design phase of the project, would a change order be necessary?

A:   From this contract, yes. Based on my understanding moving forward, we did not have design responsibility. If we were to have that, then we would have to be compensated for that.

Q:   The amount listed in the subcontract agreement that I referenced earlier, the 1,690,000 amount, that did not contemplate any design services on the part of Midwest; is that correct?

A:   That's correct.

Q:   If Midwest was to have assumed design or engineering responsibility or any services beyond installation for the project, it would have expected to be paid for such services, correct?

A:   That's correct.

Q:   For the project at issue, Midwest used Kroeschell's drawings and implemented what was provided by Kroeschell, correct?

A:   That's correct.

*                              *                              *

Q:   Was it your understanding that Kroeschell provided all of the items referenced in Exhibit A [of the Subcontract Agreement]?

A:   Yes.

Q:   Was any additional design or engineering required by Midwest beyond what was provided by Kroeschell for the project?

A:   Did Midwest provide it? No.

Q: And Midwest was to construct the project in accordance with the specifications provided by Kroeschell, Inc.?

A: Correct.

Defs.' Reply, Ex. B (Caraher Dep. 41:10 – 42:22, 43:10 – 20). John Caraher's deposition testimony is consistent with the terms of the August 16, 2005 Subcontract Agreement.

## C.     Mutual Mistake

In its opposition BMAR contends "a mutual mistake exists within the Contract, as the Contract incorrectly includes the name of Kroeschell, Inc. as the listed Architect/Engineer when it should have included Midwest as the Architect/Engineer." Pl.'s Opp'n at 4-5. BMAR refers the Court to multiple e-mails, letters and meeting minutes as evidence of the parties' intention "that Midwest was to be the Architect/Engineer for the Project and responsible for the design and installation of the boiler system under the terms of the Contract." *Id.* at 5. Dan McBride makes a similar argument during his deposition.

A: I think basically, to be honest, the page 1 listing as architect/engineer Kroeschell is a mistake. Probably should have been edited before the contract agreement was executed.

Q: But it was not edited nonetheless.

A: It's clear in other documents, numerous other documents, numerous other meeting minutes, numerous other conversations that Midwest Mechanical is the, and stamped by, and is the engineer of record.

Defs.' Mem., Ex. C (McBride Dep. 40:12 – 41:1).

In order for this Court to vary the terms of the August 16, 2005 Subcontract Agreement on the ground of mutual mistake, BMAR must prove three elements. *Abney v. Nationwide Mutual Ins. Co.*, 215 S.W.3d 699, 704 (Ky. 2006) (citing *Campbellsville Lumber Co. v. Winfrey*, 303 S.W.2d 284, 286 (Ky. 1957)).

> First, it must show that the mistake was mutual, not unilateral. *See id.* Second, "[t]he mutual mistake must be proven beyond a reasonable controversy by *clear and convincing evidence.*" *Id.* (emphasis in original). Third, "it must be shown that the parties had actually agreed upon terms different from those expressed in the written instrument." *Id.*

*Id.* (quoting *Campbellsville Lumber*, 303 S.W.2d at 286).

BMAR fails to prove the mistake, *i.e.*, identifying Kroeschell as the architect/engineer of the August 16, 2005 Subcontract Agreement instead of Midwest Mechanical, was mutual. The evidence indicates otherwise.

The numerous documents, meeting minutes and conversations BMAR claims reflect the parties' intention to transfer architect/engineer duties from Kroeschell to Midwest Mechanical *predate* the August 16, 2005 Subcontract Agreement and thus were *superseded by* the August 16, 2005 Subcontract Agreement. Any documents, meeting minutes and conversations *after* the August 16, 2005 Subcontract Agreement,[13] whereby Midwest Mechanical is referred to or identified as the project engineer with design responsibility, should have been recorded in a *change order* because this additional responsibility *alters* the terms of the August 16, 2005 Subcontract Agreement. No change orders were issued for this Subcontract Agreement.

"The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." *Cantrell*, 94 S.W.3d at 385. BMAR may have intended to transfer engineering and design responsibility to Midwest Mechanical but such an intention was not incorporated in the August 16, 2005 Subcontract Agreement, an agreement that BMAR's project manager, Bill Scott, negotiated himself. If there is a mistake, as Dan McBride concedes, it was solely a mistake by BMAR.

---

[13]    Neither BMAR nor Midwest Mechanical produced any documents *after* the August 16, 2005 Subcontract Agreement whereby Midwest Mechanical agreed that it was the architect/engineer for the boiler system project.

Second, BMAR fails to prove a mutual mistake beyond a reasonable controversy by clear and convincing evidence. Once again, the evidence indicates otherwise. The Court has quoted above a portion of John Caraher's deposition testimony delineating the circumstances whereby Midwest Mechanical was responsible for the construction phase of the agreement without any design and engineering responsibility. Dan Burrows, who was originally employed by Kroeschell and later worked for Midwest Mechanical, likewise denies any assumption of design and engineering responsibility by Midwest Mechanical.

> Q: Did you call or write Bill Scott at BMAR after receiving [the July 22, 2005 letter from Bill Scott] to tell him or BMAR that you disagreed with anything in that bullet?
>
> A: There was a conference call that occurred on July 29th that same year with John Caraher and myself, Bill Scott, and I think Dan McBride, I can't really remember. But we adamantly disagreed with [the July 22, 2005 letter].
>
> Q: That was July 29th, 2005?
>
> A: Yes.
>
> Q: Did you prepare – – submit any type of correspondence to put in writing your disagreements?
>
> A: No, we did not, because we received a contract that spelled out in very much detail as to who the engineer of record was and what drawings we were to use as the design documents, which supported our position of not being the engineer of record.

Defs.' Reply, Ex. C (Burrows Dep. 25:12 – 26:4).

Dan Burrows' deposition testimony quoted above, as well as the previously quoted deposition testimony of John Caraher, refutes BMAR's effort in establishing the third element of mutual mistake, that the parties had actually agreed upon terms different from those in writing. Moreover, Bill Scott's deposition testimony confirms there is no agreement *after the August 16,*

*2005 Subcontract Agreement* where BMAR and Midwest Mechanical established terms different from the subcontract agreement.

> Q:     Wasn't Midwest under the Subcontract Agreement to implement the design?
>
> A:   Midwest Mechanical under subcontract specific to the design was assuming the ownership of the design and all risks and liability therein.
>
> Q:   That's your contention under the Subcontract Agreement?
>
> A:   That's not a contention, it's a fact.
>
> Q:   Where does it say in the Subcontract Agreement that Midwest will assume the role of design and engineering services or will provide design and engineering services?
>
> A:   It doesn't say to provide design and engineering services.  It merely says that they will adhere to what was existing previously to them, you know, taking ownership and certifying with Midwest's title and preexisting documents.  I don't know if I made that clear enough.
>
> *                              *                              *
>
> Q:   Well, this purported transfer of the engineering and design services.
>
> A:   It's not purported, I believe we got it documented in a letter.  It was a condition for us to accept Midwest Mechanical for the construction part of the project.  That's stated in the letter.
>
> Q:   Are you referring to the July 22nd letter that we earlier looked at?
>
> A:   Yes.
>
> Q:   Are you familiar with change orders?
>
> A:   Yes.
>
> Q:   What's your understanding of a change order?

A: A change order is the addition or deduct of a subcontractor's scope of work. It can be just work oriented or it can have a fee associated with it, either added or deducted.

Q: Does the parties' Subcontract Agreement which you negotiated contain any provisions regarding change orders or modifications to the contract?

A: Yes.

Q: Are you aware of any change orders between Midwest and BMAR regarding the project?

A: At this time, no. I'd have to check to see if there were.

Q: As you sit here today do you know whether there were any change orders between Midwest and BMAR regarding design and engineering services for the project?

A: At this time I can't remember any such change orders.

Defs.' Mem., Ex. D (Scott Dep. 42:10 – 43:3, 16 – 45:4).

Contrary to BMAR's contention, there is no evidence of any mutual mistake. Instead the evidence indicates BMAR did not want to pay Midwest Mechanical for the "design" phase of the agreement because Kroeschell had already performed this task and had been paid. Midwest Mechanical would not accept design responsibility without compensation. Dan Burrows' change of employment from Kroeschell to Midwest Mechanical did not automatically make Midwest Mechanical (through Dan Burrows) the engineer of record for the boiler system project. Dan Burrows is not an architect engineer. *See* Defs.' Reply, Ex. B (Caraher Dep. 14:10 – 11). David Nelson was the project engineer when Kroeschell was the subcontractor for phases one and two. When Midwest Mechanical became the subcontractor for the third phase, Terry Aldridge was the project engineer. *Id.*, Ex C (Burrows Dep. 32:10 – 22). The August 16, 2005 Subcontract Agreement clearly and unambiguously defines the terms of the contract. Midwest Mechanical was not the architect/engineer; Kroeschell, Inc. was.

For the above reasons, the Court finds there are no genuine issues as to any material fact concerning BMAR's breach of contract claim regarding design and thus Midwest Mechanical is entitled to summary judgment on this issue.

D.    *Performance Bond*

Article 16 of the Subcontract Agreement concerns bonding.  "Unless waived in writing, Subcontractor shall furnish and pay for Payment and Performance Bonds in an amount of not less than 100% of the total dollar amount of this Agreement for each bond." Section 16.1.

Midwest Mechanical obtained a performance bond from Liberty Mutual.  Midwest Mechanical is the Principal, BMAR the obligee and Liberty Mutual the Surety.

"The liability of a surety on a construction contract is generally coextensive with that of its principal." *Kentucky Ins. Guaranty Ass'n v. Dooley Construction Co.*, 732 S.W.2d 887, 888 (Ky. App. 1987) (citation omitted).  As the Court has found *supra*, under the clear and unambiguous terms of the August 16, 2005 Subcontract Agreement, Kroeschell was the architect/engineer of record, not Midwest Mechanical.  Since the Court has found Midwest Mechanical did not breach the Subcontract Agreement regarding design, and since Liberty Mutual issued the performance bond consistent with the express terms of the August 16, 2005 Subcontract Agreement, there are no genuine issues as to any material fact supporting BMAR's claim against Liberty Mutual under the Bond as to Midwest Mechanical's alleged breach of contract regarding design.  Summary judgment on this specific issue shall be entered in favor of Liberty Mutual and against BMAR.

E.    *Additional Witness – Gary Finigan*

In support of its opposition to Midwest Mechanical and Liberty Mutual's motion for partial summary judgment, BMAR introduced an affidavit from Gary Finigan supported by e-

mails and two letters. *See* Pl.'s Opp'n, Ex. B. Midwest Mechanical and Liberty Mutual first became aware of Gary Finigan's status as a potential witness when BMAR served its supplemental answer to interrogatory no. 16 on January 8, 2010, four months after discovery closed. *See* Defs.' Mem. at 5. Midwest Mechanical and Liberty Mutual contend they will be prejudiced if they are not allowed leave to depose Mr. Finigan. In the alternative, they assert Mr. Finigan should be barred from testifying.

BMAR does not address the belated disclosure of Gary Finigan as a potential witness in its opposition. In their Reply Midwest Mechanical and Liberty Mutual reiterate their earlier position. "Defendants will be prejudiced if Mr. Finigan is not barred and, if not barred, Defendants are not allowed to depose Mr. Fini[]gan in order to thoroughly prepare their defense." Defs.' Reply at 7.

The Court has reviewed BMAR's Initial Rule 26 Disclosures. *See* Document No. 8. BMAR lists fifty (50) persons likely to have discoverable information. Gary Finigan of Kroeschell is not among the 50 individuals identified. BMAR does identify four other employees of Kroeschell. Based on a review of the documents attached to Gary Finigan's affidavit as well as Defendants' counsel asking both Dan McBride and Bill Scott questions about Gary Finigan, the Court finds Gary Finigan is an individual who has discoverable information. For this reason, Defendants are granted leave to depose Gary Finigan of Kroeschell, Inc.

An Order will be entered separately.


April 23, 2010                                        /s/
_____                    _____
Date                                         WILLIAM CONNELLY
                                    UNITED STATES MAGISTRATE JUDGE